# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NORTH DAKOTA

| United States of America, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | **ORDER DENYING** |
| | ) | **DEFENDANT'S MOTION TO** |
| vs. | ) | **SUPRESS EVIDENCE** |
| | ) | |
| Selica Jane Fender, | ) | |
| | ) | Case No. 3:17-cr-231 |
| Defendant. | ) | |

On October 18, 2017, Selica Jane Fender was charged in an indictment with the offenses of conspiracy to possess with intent to distribute and distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2 and possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. See Docket No. 20. On November 19, 2017, Fender filed a motion to suppress evidence. See Docket No. 28. On November 20, 2017, Fender filed an amended motion to suppress evidence. See Docket No. 30. In the suppression motion, Fender seeks to suppress physical evidence seized during the search of a vehicle she was driving and statements made by Fender to law enforcement. The Government filed a brief in opposition to the motion on December 7, 2017. See Docket No. 39. An evidentiary hearing was held on February 2, 2018, in Bismarck, North Dakota. See Docket No. 47. For the reasons set forth below, the Court denies the motion to suppress.

## I. BACKGROUND

On October 10, 2017, McLean County Deputy Sheriff Justin Cote-Kanning stopped a Honda Accord bearing California license plates driving north along Highway 41 in rural North

1

Dakota. At the suppression hearing, Deputy Cote-Kanning testified he stopped the vehicle because the vehicle crossed the fog line of the highway. When Deputy Cote-Kanning approached the vehicle, he indicated to the driver, later identified as Fender, that he stopped the vehicle because the vehicle "crossed the line back there." See Docket No. 38. Fender responded to Deputy Cote-Kanning by apologizing and indicated she had been washing her face. Deputy Cote-Kanning then requested Fender produce her license, vehicle registration, and proof of insurance. Deputy Cote-Kanning then asked Fender where she was coming from and where she was going. Fender responded and indicated she was traveling from California to Belcourt, North Dakota. While searching for documents, Fender also stated the vehicle belonged to a friend. Deputy Cote-Kanning then informed Fender that as long as everything came back clear he would only issue her a written warning. See Docket No. 38.

Deputy Cote-Kanning testified that Fender was extremely nervous, with shaky hands, during their brief initial interaction. In fact, on the dash camera recording, Deputy Cote-Kanning can be heard saying "She is extremely nervous." See Docket No. 38. Deputy Cote-Kanning then returned to Fender's vehicle and issued her a warning for care required. After doing so, Deputy Cote-Kanning stated he had a couple of questions and inquired whether Fender had anything illegal in the vehicle, such as guns, knives, narcotics, or large sums of cash. Fender responded by stating none of those items were in the vehicle. Deputy Cote-Kanning than asked if he could search the vehicle and Fender responded "Go ahead." Fender proceeded to get out of the vehicle and move toward the patrol vehicle, where Deputy Cote-Kanning conducted a pat down for weapons and requested Fender remove the contents of her pockets. Deputy Cote-Kanning then asked Fender to remain near the patrol vehicle while Deputy Cote-Kanning searched the vehicle for approximately eight (8) minutes, including a

search of the trunk and under the front hood. At one point during the search, Fender instructed Deputy Cote-Kanning how to access the trunk. While conducting his search, Deputy Cote-Kanning also searched the contents of several bags and suitcases located in the trunk of the vehicle. From her location, Fender was able to watch Deputy Cote-Kanning search the vehicle, but at no point did Fender object to Deputy Cote-Kanning's search.

After he completed the vehicle search, Deputy Cote-Kanning approached Fender and inquired further about Fender's trip from California to North Dakota. Specifically, Deputy Cote-Kanning asked Fender who she was going to see in Belcourt. Fender responded that she was on her way to a friend's baby shower. Deputy Cote-Kanning then asked Fender the name of her friend, but Fender could not remember her friend's name, despite that she had been driving for at least two days, cross-country for the event. While trying to remember the name of her friend, Fender explained she was actually friends with the husband or boyfriend of the pregnant friend. Deputy Cote-Kanning then asked if Fender knew where her friend lived. Fender stated her friend lived in Belcourt and she was going to the casino to meet her friends. Deputy Cote-Kanning then proceeded to question Fender about her travel plans, including where she planned to stay while in North Dakota, how long she planned to stay in North Dakota, when and where the baby shower was scheduled, ownership of the vehicle, and her employment in California. After approximately seven (7) minutes, Deputy Cote-Kanning told Fender another law enforcement officer would be arriving soon and would likely have some questions for her. In the interim, Deputy Cote-Kanning told Fender her story was "not sounding appropriate, at all." See Docket No. 38.

While Deputy Cote-Kanning was asking Fender about the purpose and details of her travel to North Dakota, Deputy Hulm arrived. Shortly after the arrival of Deputy Hulm, while

3

Deputy Cote-Kanning was asking Fender about her travel plans, Fender became somewhat agitated and asked Deputy Cote-Kanning whether he thought she was lying. Deputies Cote-Kanning and Hulm responded to Fender by stating that they were trying to understand Fender's story. Shortly thereafter, Detective Krohmer arrived, asked Fender a few questions about her travels, and then asked whether they could take a look at the vehicle. Fender indicated the officers could search the vehicle. During the second search of the vehicle, Deputy Hulm stood with Fender, conversed with her, and continued to ask her general questions while Detective Krohmer and Deputy Cote-Kanning searched the vehicle. Eventually, a Detective Matties arrived at the scene. Detective Matties joined other law enforcement officers in the search of the vehicle. During the search of the vehicle, Detective Matties picked up a plastic bag, walked over to Fender, and asked, "What was in here?" It is unclear from the dash camera video whether Fender responded to the question. Detective Krohmer also asked Fender several questions while he searched the trunk of the vehicle. Again, it is unclear from reviewing the dash camera video what Fender's response was.

Deputy Cote-Kanning testified that while he was searching the vehicle, while he had the backseat of the car down, he located a loose piece of felt fabric. It appeared to be covering a compartment that was not accessible through the truck. Deputy Cote-Kanning lifted the fabric and located a secret compartment containing what looked like narcotics. Contemporaneous to the location of the secret compartment, Detective Matties approached Fender, stating "Here's the deal, kid." He then explained to Fender what the officers located as a result of their search. After doing so, Detective Matties then asked Fender questions, which are inaudible on the dash camera recording, with reference to the likely narcotics found in the car. Fender responded to the questioning with "I have no idea" several times. Detective Matties returned to searching

4

the vehicle but then again came back to Fender and began asking her further questions before handcuffing her and advising her she was under arrest for attempted distribution of methamphetamine in North Dakota, and advised Fender of her *Miranda* rights. The law enforcement officers located 22.69 lbs. of methamphetamine and 2.15 lbs. of marijuana in the car.

Fender was eventually charged in an indictment with the offenses of conspiracy to possess with intent to distribute and distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2 and possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. See Docket No. 20. Fender filed the suppression motion before the Court on November 20, 2017. See Docket No. 30. In the motion, Fender seeks the suppression of evidence obtained during the search of the vehicle and statements made to officers on October 10, 2017. Fender specifically asserts the evidence and statements should be suppressed because (1) the initial stop of the vehicle was without probable cause or reasonable suspicion of criminal activity; (2) Fender's initial consent to search the vehicle was unreasonable; (3) Fender's consent to the second search of the vehicle was not voluntary, was without intelligent consent, and was the product of duress and coercion; (4) the duration and method of search, along with the detention of Fender constituted a seizure, amounted to an arrest, or otherwise made any consent involuntary and the product of coercion and duress; (5) Fender was subjected to custodial interrogation without the benefit of a *Miranda* warning in violation of her constitutional rights. See Docket No. 30, pp. 2-3.

## II. LEGAL DISCUSSION

In her motion to suppress evidence, Fender contends law enforcement officers conducted an unlawful stop of her vehicle on October 10, 2017, and conducted an unlawful search of her vehicle because Fender's consent to search the vehicle was not voluntary. Fender also contends the officers subjected her to a custodial interrogation in violation of *Miranda*.

### A. TRAFFIC STOP

Fender first contends probable cause did not exist for Deputy Cote-Kanning to stop the vehicle she was driving on October 10, 2017. It is well established in the Eighth Circuit that "a traffic violation - however minor - creates probable cause to stop the driver of a vehicle." United States v. Linkous, 285 F.3d 716,719 (8th Cir. 2002). Even if the traffic stop is a pretext for another investigatory purpose, a traffic violation still creates probable cause. Id. Here, the recording from Deputy Cote-Kanning's dash camera clearly demonstrates the vehicle Fender was driving touched the fog line along the highway multiple times and crossed the line at one point while Deputy Cote-Kanning was following the vehicle. When Fender was informed by the officer why he had stopped the vehicle, she responded and apologized, stating she has been washing her face. Based upon such undisputable evidence, it is clear to the Court that Deputy Cote-Kanning had a reasonable, articulable suspicion that a traffic law was violated and, therefore, his initial traffic stop of Fender was valid.

### B. CONSENT TO SEARCH VEHICLE

Fender next contends her consent to the search of the vehicle was unreasonable under the circumstances and the searches were beyond the scope of any such consent. The Defendant

does not appear to contest that Fender's consent to the initial search was voluntary.[1] The Government asserts Fender's consent to search the vehicle on two separate occasions, were voluntary, and not the product of duress or coercion. The Court examines the circumstances of each instance in turn to determine whether such consent was given voluntarily to search the vehicle.

According to the Eighth Circuit Court of Appeals, consent to a search is voluntary "if the consenting individual has a reasonable appreciation of the nature and significance of [her] actions." United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007) (quoting United States v. Rambo, 789 F.2d 1289, 1297 (8th Cir. 1986)). Moreover, consent is voluntary when it is "the product of an essentially free and unconstrained choice by its maker" rather than "the product of duress or coercion, express or implied." Schneckloth v. Bustamonte, 412 U.S. 218, 225-227. The Government carries the burden of proving by a preponderance of the evidence that consent was voluntary. Id. at 1137.

To evaluate whether Fender's consent was voluntary, the Court is required to examine the totality of the circumstances and consider the following relevant factors: (1) her age, (2) her general intelligence and education, (3) whether she was intoxicated or under the influence of drugs when consenting, (4) whether she consented after being informed of her right to withhold consent or of her *Miranda* rights, and (5) whether she was aware of the protections afforded to suspected criminals. United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Further, the Court should also consider whether the person who consented (1) was detained and questioned for a long or short period of time; (2) was threatened, physically intimidated, or punished by

---

[1] The Defendant acknowledges in her brief "Fender appears to have consented to an initial search of the motor vehicle freely and voluntarily . . . ." See Docket No. 29, p. 8.

7

the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in public or a secluded place; or (6) either objected to the search or stood silent while the search was conducted. Id.

The Defendant appears to concede she voluntarily consented to the initial search of the vehicle. See Docket No. 29, p. 8. Nonetheless, based upon a review of the recording from the dash camera, the Court independently concludes Fender voluntarily consented to the initial search of the vehicle by Deputy Cote-Kanning. None of the factors outlined in *Chaidez* weigh in favor of finding Fender's initial consent was the result of duress or coercion, but instead weigh in favor of finding Fender's consent was the result of "free and unconstrained choice" by Fender. See Chaidez, 906 F.2d at 381.

The Court then turns to evaluate whether Fender voluntarily consented to the second search of the vehicle that occurred after several other law enforcement officers arrived at the scene. Based upon the Court's review of the dash camera video and the testimony elicited at the suppression hearing, at the time of consent Fender does not appear to be intoxicated or under the influence of drugs. Fender was thirty-four (34) years old at the time and appeared to be able to understand and effectively communicate with the officers, demonstrating adequate intelligence and education. In addition, the record reveals Fender had previously been arrested, which suggests she had an increased awareness of her rights. See United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003); Chaidez, 906 F.2d at 381 (noting the defendant's prior encounters with the criminal justice system increased his awareness of the rights of accused persons).

Moreover, the environmental factors under which Fender consented to the second search, on the whole, reinforce the conclusion that Fender consented to the second search of the

vehicle. Fender was not under arrest[2] at the time she consented to the second search; nor was Fender detained and questioned for an extended period of time prior to consenting to the search. While four law enforcement officers were present, no evidence presented during the suppression hearing suggests the officers intimidated, threatened, or coerced Fender at any time in any manner to consent to the search. See United States v. VaLerie, 424 F.3d 694, 709 (8th Cir. 2005) (en banc) (concluding the presence of several law enforcement officers surrounding defendant did not negate the defendant's consent to search). The dash camera video reveals law enforcement officers treated Fender respectfully during their interactions and the search took place on an open state highway in McLean County, North Dakota. Fender also fully cooperated with officers during the traffic stop, as well as the search of the vehicle.

The Court is aware that none of the officers informed Fender of her right to withhold consent to search the vehicle. Fender was also not given a *Miranda* warning. The Court also notes that although the location of the vehicle search was certainly public, the searches occurred in a rural area of North Dakota, miles away from any town. The Court recognizes that these circumstantial factors may have had the subtle effect of diminishing the voluntariness of Fender's consent to search the vehicle. Even considering these circumstantial factors that may have had a de minimal effect on the voluntariness of Fender's consent, the Court finds Fender's consent to the second search was voluntary. The Court is ever mindful of Fender's cooperative nature and the non-confrontational mannerisms of law enforcement officers during their interactions with her, causing the totality of the circumstances to weigh in favor of the Court concluding Fender's consent to the second search was voluntary. See Chaidez, 906 F.2d at 381.

---

[2] The Court notes the Eighth Circuit Court of Appeals has expressly recognized that even if a suspect is in custody, she may voluntarily consent to a search. United States v. Comstock, 531 F.3d 667, 678 (8th Cir. 2008) (quoting Chaidez, 906 F.2d at 382).

9

The Defendant also contends the vehicle searches were beyond the scope of her consent to search. "A consensual search may not legally exceed the scope of the consent supporting it." Id. at 382. At the suppression hearing, defense counsel asserted Fender could not have voluntarily consented to the scope of the search, namely to the secret compartment in which the drugs were found, because she was unable to view what areas the officer was searching in the backseat of the car from her location by the patrol car. In numerous cases, the Eighth Circuit Court of Appeals has found suspects' consent to search a vehicle may extend to searches of compartments, including secret compartments, which are an integral part of the vehicle. United States v. Ferrer-Montoya, 483 F.3d 565, 568-69 (8th Cir. 2007); United States v. Barragan, 379 F.3d 524, 530 (8th Cir. 2004) (concluding that when the defendant consented to search the entire vehicle for drugs, money, and explosive, it was reasonable for officers to believe the consent extended to a compartment integral to the car).

Just prior to asking Fender for consent to search the vehicle, Deputy Cote-Kanning inquired whether Fender had anything illegal in the vehicle, such as guns, knives, narcotics, or large sums of cash. Deputy Cote-Kanning's question well defines the scope of the search: guns, knives, narcotics, or large sums of cash. Fender granted generally permission to search the vehicle. Deputy Cote-Kanning could reasonably interpret Fender's unqualified consent to search the vehicle to include the search of any compartments or containers within the vehicle that may contain guns, knives, narcotics, or large sums of cash. See Ferrer-Montoya, 483 F.3d at 568. Additionally, at no point during either the initial or second search of the vehicle, did Fender withdrew her consent, object to the scope of the search, or inform the officers she would like them to stop the search. Based upon the Court's careful review of the video from the dash camera, and the testimony presented at the suppression hearing, it is clear Fender acquiesced to

the broad scope of the vehicle search. See Chaidez, 906 F.2d at 382-83. Under the totality of the circumstances, the Court concludes the scope of both vehicle searches did not exceed the scope of Fender's consent. The Court finds the Government has met its burden and proven by the preponderance of the evidence that the consent to search was voluntary.

### C. STATEMENTS BY FENDER

Fender next contends the officers subjected her to a custodial interrogation in violation of *Miranda* and any statements she made should be suppressed. The Fifth Amendment of the United States Constitution provides a privilege against self-incrimination. Given this Fifth Amendment privilege, certain procedural safeguards must be employed prior to interrogation of an individual by law enforcement officers. Miranda v. Arizona, 384 U.S. 436, 444 (1966). It is well-established that law enforcement officers must administer *Miranda* warnings whenever a suspect is "taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Id. at 478-79. The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination and the right to the assistance of an attorney when an individual is taken into custody for questioning. United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990)). Accordingly, *Miranda* requires that law enforcement officers advise an individual as to the availability of this privilege against self-incrimination and to the assistance of counsel when the individual is interrogated while in custody. Id. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-74.

"*Miranda* warnings are required when a suspect is interrogated while in custody." United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011). For purposes of *Miranda*, an individual is in custody when she is either formally arrested or her freedom of movement is constrained to a degree equivalent with formal arrest. United States v. Brave Heart, 397 F.3d 1035, 1038 (8th Cir. 2005). Custody depends on the totality of the circumstances, and the relevant factors, known as *Griffin* factors, to consider include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police-dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

Aldridge, 644 F.3d. at 711 (citing United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). The ultimate test is whether a reasonable person in that position would have felt free to end the interview. Id. "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002).

In Berkemer v. McCarty, 468 U.S. 420 (1984), the United States Supreme Court concluded *Miranda* warnings are not mandatory during routine traffic stops due to the non-threatening and non-coercive nature of such stops. However, in its analysis, the Supreme Court cautioned that *Miranda* warnings are required if, at any point during a stop, a suspect's freedom is curtailed to a "degree associated with formal arrest." Berkemer, 468 U.S. at 440 (citing California v. Beheler, 463 U.S. 1121, 1125 (1983)(*per curiam*)). In the matter before the Court,

the law enforcement officers were certainly permitted to question Fender consistent with the proper scope and purpose of the traffic stop. Nonetheless, pursuant to the Supreme Court's directive in *Berkemer*, the Court must consider whether Fender's freedom was curtailed to a degree associated with a formal arrest at some point during the stop. See Berkemer, 468 U.S. at 440.

The Court concludes that Deputy Cote-Kanning had a reasonable, articulable suspicion to justify the initial traffic stop. The question for the Court to then consider is whether the officers' actions transformed the initial, justifiable traffic stop into an instance in which officers should have administered a *Miranda* warning. The evidence presented at the suppression hearing unquestionably demonstrated the traffic stop in this matter began as a typical roadside traffic stop that did not require the procedural safeguards of *Miranda*. Typically, these roadside traffic stops are brief, conducted in public, outside a police-dominated environment, and motorists expect they will continue their travels after an officer issues a citation. See Berkemer, 468 U.S. at 437-439. Thus, questioning during a typical traffic stop is different than "stationhouse interrogation," which is frequently prolonged and police dominated. Id. at 438-39. Therefore, the Court must consider whether Fender's freedom of movement was curtailed to a "degree associated with formal arrest" to require the officers to administer a *Miranda* warning at any point after the initial traffic stop concluded when Deputy Cote-Kanning issued Fender a warning citation. Berkemer, 468 U.S. at 440 (citing California v. Beheler, 463 U.S. 1121, 1125 (1983)(*per curiam*)).

The Court concludes the factors outlined in *Griffin* do not weigh in favor of a finding Fender was in custody during any portion of the stop. Shortly after Deputy Cote-Kanning issued Fender a warning citation, Fender gave Deputy Cote-Kanning consent to search the

vehicle. Consequently, Fender got out of the vehicle and Deputy-Cote-Kanning escorted her to the front of his patrol car. Deputy Cote-Kanning then conducted a pat-down of Fender for safety purposes. Deputy Cote-Kanning did not inform Fender she was being detained. Fender was not handcuffed or restrained in anyway while Deputy Cote-Kanning searched the vehicle. Shortly after the initial search of the vehicle, while Deputy Cote-Kanning questioned Fender, additional law enforcement officers arrived at the scene. Deputy Cote-Kanning also did not inform Fender she was free to leave after he concluded the traffic stop or after the initial search of the vehicle.

Although these circumstantial factors suggest Fender's freedom of movement was arguably curtailed, the Court is not persuaded these factors outweigh those *Griffin* factors that weigh in favor of finding Fender was not in custody. Although three officers were present during much of Fender's interaction with law enforcement, none of the officers employed strong arm tactics or deceptive strategems during questioning. As discussed above, the officers were courteous and polite toward Fender. In fact, at one point, Fender requested a cigarette from the vehicle, which an officer retrieved for her. Further, the questioning of Fender took place on the side of a public highway. See Berkemer, 468 U.S. at 438 (concluding "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statement and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse"). Although Fender remained in front of the patrol vehicle during the duration of her interaction with the officers, she was never instructed she had to remain there. Moreover, the Court finds those the factors articulated in support of the conclusion that Fender's consent to search the vehicle was voluntary similarly weigh in favor of finding Fender was not in custody.

Instructive to the Court's analysis is the general rule that "temporary and relatively nonthreatening detention involved in a traffic or *Terry* stop does not constitute *Miranda* custody." Maryland v. Shatzer, 559 U.S. 98, 113 (2010). Based on a careful consideration of the *Griffin* factors and an analysis of the totality of the circumstances, the Court finds Fender was not subjected to a formal arrest or restraint on her freedom of movement to the degree associated with arrest during the traffic stop and prior to her arrest. See Berkemer, 468 U.S. at 440. The Court finds that Fender was not in custody for purposes of *Miranda* during the stop and prior to her formal arrest. While Fender was standing near her vehicle prior to her arrest, she was not physically restrained. Although a pat down search occurred, it was done for officer safety and did not limit Fender's freedom of movement. There was never any strong-arm tactics or deceptive stratagems employed during the questioning. And, Fender was at all time cooperative and voluntarily responded to questions without hesitation. Based on the totality of the circumstances, the Court finds the suppression of any statements made by Fender on October 10, 2017, is not warranted.

### III.     CONCLUSION

The Court has carefully reviewed the entire record, the parties' arguments, the evidence presented at the suppression hearing, and the relevant case law. For the reasons outlined above, the Court **DENIES** Fender's amended motion to suppress (Docket No. 30).

**IT IS SO ORDERED.**

Dated this 6th day of February, 2018.

>     */s/ Daniel L. Hovland*
>     Daniel L. Hovland, District Judge
>     United States District Court